Terry D. NOLDE, Plaintiff,

v.

HAMM ASPHALT, INC.,
Defendant/Third–Party
Plaintiff,

v.

Dustrol, Inc., Third–Party Defendant.

No. 00–2243–DES.

United States District Court,
D. Kansas.

May 10, 2002.

Keith E. Renner, Barnett & Renner, PA, Auburn, KS, for Plaintiff.

Eric A, Van Beber, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Overland Park, KS, Lynn W. Hursh, Darren K. Sharp, Armstrong Teasdale LLP, Kansas City, MO, Daniel P. Hanson, Hanson & Gurney, Overland Park, KS, for Defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on Defendant/Third–Party Plaintiff Hamm Asphalt, Inc.'s ("Hamm") Motion for Summary Judgment (Doc. 83); Third–Party Defendant Dustrol, Inc.'s ("Dustrol") Motion for Summary Judgment (Doc. 78); and Hamm's Motion for Revisions to Pretrial Order (Doc. 88). Within this diversity action, plaintiff alleges Hamm is liable for injuries he sustained as a result of a motorcycle accident, which occurred on a section of public highway being reconditioned by Hamm and Dustrol. Hamm alleges it is entitled to be indemnified by Dustrol. For the following reasons, Hamm's motion for summary judgment is denied, Dustrol's motion for summary judgment is granted in part and denied in part, and Hamm's motion for revisions is granted.

## I. BACKGROUND

At approximately 2:30 a.m., on June 15, 1998, while riding his motorcycle through a construction zone along Highway 75 in Brown County, Kansas, plaintiff was involved in a single motorcycle accident. Unfortunately, plaintiff has no memory of the events preceding the accident, the accident itself, or the days following the accident. Plaintiff was, however, accompanied on the ride by his friend and riding companion, Bobby Greeno ("Greeno"). Greeno

was riding his own motorcycle ahead of plaintiff at the time of the accident. Due to plaintiff's complete memory loss, Greeno is the only available witness to the accident.

Within his Amended Complaint (Doc. 28), plaintiff alleges negligence against Hamm for its failure to maintain and warn of the condition of the roadway where plaintiff's accident occurred. In turn, Hamm filed a Third–Party Complaint (Doc. 26) against Dustrol claiming both common law and contractual rights to indemnification.

On December 31, 1997, Hamm entered into a contract with the Kansas Department of Transportation ("KDOT") to surface recycle and bituminous overlay the portion of Highway 75 at issue in this case. Thereafter, on January 16, 1998, Dustrol entered into a contract with Hamm to perform highway construction on the section of Highway 75 as a subcontractor under Hamm. It is controverted by all three parties as to the specific duties the Hamm/KDOT contract imposed on Hamm regarding the posting of certain warning signs and application of temporary edge markings. In any event, however, it is uncontroverted that at the time of the accident, only one sign was posted indicating the presence of a construction zone and no signs were posted indicating an uneven surface between the roadway and the shoulder. Furthermore, the straight edge[1] separating the roadway from the shoulder was not marked with any type of line or marker. Plaintiff alleges the drop-off between the roadway and the shoulder was three to six inches. While Hamm

accepts there was a drop-off, it disputes the height of the drop-off and the origin of its creation.

Plaintiff describes the events surrounding his accident as follows:

[Plaintiff]'s motorcycle went off of the road (which had no edge marker marking where the road surface ended and the shoulder drop-off began) and onto the shoulder. The shoulder was three to six inches lower than the road surface. When [plaintiff] attempted to drive back onto the road, his motorcycle struck the three to six inch edge of the road surface, which caused him to lose control of his motorcycle. [Plaintiff] attempted to fight the motorcycle back under control, but was unsuccessful. As a result of losing control from hitting the drop-off, [plaintiff] crashed and suffered injuries.

(Pl.'s Response at 4, Statement of Uncontroverted Facts ¶ 23).

Hamm strongly disputes plaintiff's version of the facts. In particular, Hamm asserts plaintiff's description is based solely on conclusory statements made by Greeno. In fact, what caused plaintiff's accident is at the heart of the matter presently pending before the court. In short, Hamm alleges plaintiff has failed to present any evidence of causation to support his negligence claim, so Hamm moves for summary judgment. On the other hand, within Dustrol's motion, Dustrol argues Hamm has no claim for indemnification based on Kansas' comparative fault doctrine, so Dustrol moves for summary judgment.

---

1. Although Hamm alleges it is controverted whether the drop-off separating the roadway and the shoulder was a straight edge, as compared to a beveled edge, the court's review of Hamm's filing indicates no actual dispute. Hamm's filing states: "Controverted but immaterial. It is immaterial that the drop-off from the road surface to the shoulder was a straight edge drop-off. Plaintiff has presented no evidence that the straight edge drop-off was the cause of plaintiff's accident." (Hamm's Reply at 2, Response to Pl.'s Statement of Uncontroverted Facts ¶ 13). Therefore, for purposes of this proceeding, the court accepts as uncontroverted plaintiff's allegation of a straight edge drop-off.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).[2] The rule provides that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law identifies which facts are material. *Id.* at 248, 106 S.Ct. 2505. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). The movant may discharge its burden "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. 2548. Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the materi-

al facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (interpreting Fed. R.Civ.P. 56(e)). Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Id.* at 322, 106 S.Ct. 2548. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. 2548.

A court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block*, 788 F.2d 1433, 1435 (10th Cir.1986) ("The court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues."). The court's function is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the nonmovant for a finder of fact to return a verdict in that party's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Id.* at 250, 106 S.Ct. 2505.

---

**2.** In setting forth the appropriate standard of review, the court has rejected plaintiff's assertion that the court must employ a summary judgment standard endorsed by the Kansas courts for use within negligence actions. While it is axiomatic that the court will apply Kansas' substantive law in this diversity action, the court is still obligated to apply the state law through the rubric of Rule 56(c) and

federal case law. *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1016 (10th Cir.2001) ("This diversity action is governed by Oklahoma's substantive law, but we are governed by federal law in determining the propriety of the district court's grant of summary judgment.") (citing *Pegasus Helicopters, Inc. v. United Techs. Corp.*, 35 F.3d 507, 510 (10th Cir. 1994)).

## III. DISCUSSION

### A. Hamm's Motion for Summary Judgment

#### 1. Substantive Law and Essential Elements

■ Under Kansas law, plaintiff's prima facie case of negligence is composed of four necessary elements. In *Nero v. Kansas State Univ.*, 253 Kan. 567, 861 P.2d 768, 772 (1993), the Kansas Supreme Court described the four elements as follows: "To recover for negligence, the plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact." *See also C.J.W. v. State*, 253 Kan. 1, 853 P.2d 4, 9 (1993); *Honeycutt v. City of Wichita*, 251 Kan. 451, 836 P.2d 1128, 1136 (1992). Normally, the presence or absence of negligence is a question of fact reserved for the jury. *Honeycutt v. City of Wichita*, 247 Kan. 250, 796 P.2d 549, 551 (1990). These issues, however, may be resolved on summary judgment when the facts present only one reasonable conclusion. *Lay v. Kansas Dep't of Transp.*, 23 Kan.App.2d 211, 928 P.2d 920, 924 (1996).

According to Hamm, plaintiff has failed to present sufficient evidence of causation in order for his claim to survive summary judgment. *See generally Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548 (holding there can be no genuine issue as to any material fact when the plaintiff offers no proof concerning an essential element of their case); *Eck*, 256 F.3d at 1016–17 ("To avoid summary judgment, the nonmovant must make a showing sufficient to establish an inference of the existence of each element essential to the case."). Hamm, however, levies no argument regarding plaintiff's proffered evidence concerning Hamm's duty, Hamm's breach, or plaintiff's injury. Therefore, the court will confine its discussion only to the sufficiency of plaintiff's evidence relating to causation.

#### a. Causation

In regards to causation, Hamm lodges two arguments: (1) plaintiff has no evidence to demonstrate that a road condition caused plaintiff's motorcycle to leave the roadway; and (2) plaintiff has no evidence to demonstrate that the edge of roadway caused plaintiff to lose control of his motorcycle.

As mentioned earlier, plaintiff asserts he lost control of his motorcycle because of the drop-off edge between the roadway and the shoulder. As interpreted by the court, plaintiff also appears to be asserting that his original deviation from the roadway onto the shoulder was caused by Hamm's failure to properly warn him of the drop-off. Due to plaintiff's incapacitation, however, this assertion is based primarily on the testimony and recollection of Greeno.

##### i. Plaintiff's Evidence

According to Greeno, prior to plaintiff's accident, the two men were traveling within the posted speed limit on Highway 75. (Greeno Dep. at 103). There was, however, very little ambient light, making it difficult to see in the early morning hours. (*Id.* at 62). As they approached the accident site, Greeno heard a noise behind him. (*Id.* at 34). Looking into his rearview mirror he saw that plaintiff's headlights were "not right." (*Id.* at 38). In addition, Greeno observed sparks emanating from plaintiff's motorcycle. (*Id.*). Greeno immediately knew plaintiff was "crashing." (*Id.* at 40). Within a second, Greeno looked back over his right shoulder and observed plaintiff's motorcycle "flip back and forth sideways." (*Id.* at 34, 42). According to Greeno, plaintiff was attempting to steady the motorcycle, but the cycle eventually fell completely down on

one side and slid off the roadway. (*Id.* at 41–43).

The next day, Greeno returned to the crash site and observed the following:

> What I seen, tracks where [plaintiff] had gone off the side of the road and what it appeared to be when he tried to come back on the side of the road—the way our [motorcycles] are made where the roll bar comes down and connected to the frame there wasn't enough clearance. When I got back to the bike there was blacktop in that bracket so it looks like it snagged and came back up on the highway that caused him to start flipping. . . .
>
> Well, there was tire tracks going in the gravel and then there was big old gouge in the blacktop . . . . There was a big old gouge out of the blacktop, the edge of the blacktop but it continued on, scrapes and shit in the blacktop.
>
> . . . .
>
> I saw gouge marks, tire tracks, blood, the whole scene where I had to deal with it. That's what I saw, and when I got the bike being as I was out there doing that I seen blacktop scrunched up in certain places. Like if you ride down a muddy road and mud would get up in cracks, you've got a big old clump of blacktop in the roll bar, the bracket. There is a clump out of the asphalt, I guess you assume that's where it came from.

(*Id.* at 65–67, 71). As far as the drop-off, Greeno estimated the roadway was three to six inches higher than the shoulder. (*Id.* at 72).

In addition to Greeno's testimony, plaintiff directs the court's attention to the accident report completed by the investigating law enforcement officer. (Hamm's Reply, Ex. A). The report states:

> U–75, north & southbound has a new overlay. There are center line reflectors but no edge lines.

The new overlay is about 3–4 inches higher than the shoulder. It appears that [plaintiff] went off onto the shoulder and when he attempted to come back onto the roadway the bike went to its side. The bike came to rest 364 feet, 4 inches from where it first left the roadway. The bike went off the concrete shoulder into a concrete culvert on the east side of the road.

(*Id.* at 2).

The brunt of Hamm's arguments revolve around Greeno's admission that he did not observe plaintiff's original deviation into the shoulder nor did Greeno actually see plaintiff's roll bar catch on the drop-off. In fact, according to Hamm, "Greeno's testimony fails to provide *any* insight as to when or how the plaintiff lost control of his motorcycle." (Hamm's Reply at 18) (emphasis in original). Furthermore, Hamm asserts Greeno is not competent as a lay witness to testify regarding his theory that plaintiff's roll bar caught on the drop-off.

### ii. Causation Conceptually in Kansas

As a starting point, the court must first consider the concept of causation as interpreted and applied by the Kansas Supreme Court within negligence actions. Once identified, the court can then consider whether plaintiff has presented sufficient evidence on the issue to survive summary judgment.

Within its filings, Hamm relies extensively on the Kansas Supreme Court's discussion of causation in *Baker v. City of Garden City*, 240 Kan. 554, 731 P.2d 278, 282 (1987) (affirming directed verdict). In *Baker*, an injured motorist brought a negligence action against the City of Garden City, Kansas, and KDOT. 731 P.2d at 278. The plaintiff was injured when a eighteen-wheel tractor-trailer, driven by Mr. Tyson, ran a red light and collided with the plaintiff's vehicle. *Id.* at 280. The plaintiff claimed the defendants were liable for

their negligence in erecting temporary traffic signals at the intersection in question. *Id.* In particular, the signals were apparently improperly installed and timed. *Id.*

During the trial, very little information was offered as to why Mr. Tyson ran the red light.

"There is no further testimony or evidence attributed to Mr. Tyson and the circumstances in which he found himself on that fateful day. Did he see the light but failed to stop because of fatigue? Was he daydreaming? Was his attention distracted by a roadside object? Was there a mechanical malfunction when he tried to stop? Or did he see the light but due to improper sequence was unavailable—or unable to stop no matter what he did?"

*Id.* at 282 (quoting trial court). The Kansas Supreme Court summarized the defendants' position as follows: "In the present case it was the position of the defendants that even if the temporary signals were not properly installed and timed, there was no showing that such defects were the cause of Tyson's running the red light and the resultant collision with [the plaintiff's vehicle]." *Id.* at 281.

After defining the term causation and identifying the plaintiff's burden, the Kansas Supreme Court concluded

that there was insufficient evidence to establish that the timing and/or improper installation of the temporary traffic signals caused Tyson's failure to stop. It would be sheer speculation to conclude that some defect in the installation and function of the temporary signal caused Tyson to fail to see the signals in

time to stop his vehicle and avoid the crash.

*Id.* at 283.

Without question, the facts of *Baker* bear a striking similarity to the present case. For without plaintiff's testimony and due to Greeno's limited observations, Hamm asserts it is impossible to determine what exactly transpired on Highway 75. Borrowing apparently from *Baker*, Hamm rhetorically asks:

Did plaintiff hit an object in the roadway? Did an animal dart out in front of plaintiff's path? Was plaintiff under the influence of marijuana and amphetamines? Did plaintiff simply fall asleep? Was the plaintiff simply not watching out for his own safety? Based upon the evidence available in this case, it is simply impossible to determine what caused plaintiff's accident.

(Hamm's Mem. in Support at 13). Left only with *Baker* to guide its decision, the court very well may have agreed with Hamm's position.

It must first be acknowledged, however, that the *Baker* court was weighing the sufficiency of the plaintiff's causation evidence within the strict context of the doctrine of proximate cause.[3] In fact, the Kansas Supreme Court observed that the required "causal connection" was only satisfied by a showing that the defendants' breach was "the actual and proximate cause of the injury." *Baker*, 731 P.2d at 280. According to the Kansas Supreme Court, therefore, "[t]he plaintiff had the burden of proving that the negligence of the [defendants] caused the damage suffered by the plaintiff." *Id.* at 282.

---

**3.** The *Baker* court defined "proximate cause" as "that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act." 731 P.2d at 280 (citing *Wilcheck v. Doonan Truck & Equip., Inc.*, 220 Kan. 230, 552 P.2d 938, 942 (1976)).

In the years following *Baker,* even though the doctrine of comparative fault was well established in Kansas,[4] both federal courts applying Kansas law and Kansas state courts routinely followed *Baker's* adherence to proximate cause when considering an alleged tortfeasor's act's causal connection to a plaintiff's injury. *See, e.g., Carl v. City of Overland Park,* 65 F.3d 866, 872 (10th Cir.1995) (quoting *Baker's* definition of causation and proximate cause); *Lay,* 928 P.2d at 924 (same).

While the court takes no position today on the propriety of applying proximate cause within a comparative fault system, *but see Exxon Co. v. Sofec, Inc.,* 517 U.S. 830, 837, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996) ("There is nothing internally inconsistent in a system that apportions damages based upon comparative fault only among tortfeasors whose actions were proximate causes of an injury. Nor is there any repugnancy between the superseding cause doctrine, which is one facet of the proximate causation requirement, and a comparative fault method of allocating damages."), the Kansas Supreme Court has recently found the doctrine of proximate cause to be outdated under Kansas law. *Reynolds v. Kansas Dep't of Transp.,* 43 P.3d 799 (Kan.2002) (opinion issued on April 19, 2002).

*Reynolds* was a personal injury and wrongful death case stemming from a vehicular accident in which plaintiffs' vehicle struck a cow while traveling on a public highway. 43 P.3d at 800–801. Among others, plaintiffs sued KDOT claiming its negligent maintenance of a livestock fence allowed the cow access to the highway. *Id.* at 801. At trial, the jury found KDOT thirty-five percent at fault, but the Kansas Court of Appeals reversed finding that the cow's original escape from its pasture via a culvert was the proximate cause of the accident, for which KDOT bore no responsibility. *Id.* at 802.

After discussing the utility of proximate cause within a comparative fault framework, the Kansas Supreme Court stated that "[w]ith the adoption of comparative fault, Kansas has moved beyond the concept of proximate cause in negligence." *Id.* at 804. In reversing the Kansas Court of Appeals, the Kansas Supreme Court especially criticized the appellate court's apparent belief that only one cause could exist for the accident. *Id.* The *Reynolds* court also rejected KDOT's argument that no direct evidence existed proving that the interloping cow left private land through the fence gap created by its negligence. *Id.* at 805. Instead, the Kansas Supreme Court was satisfied sufficient circumstantial evidence existed demonstrating KDOT's negligence contributed to the accident. *Id.* ("From this evidence, it reasonably may be inferred that the cattle crossed a KDOT fence to get onto State land, and, moreover, it reasonably may be inferred that the cattle crossed the fence where it was down.").

Therefore, in light of *Reynolds,* when addressing the necessary causal connection in the present action, the court is not to

---

**4.** Kansas adopted comparative fault in 1974, and the relevant statute reads, in part, as follows:

The contributory negligence of any party in a civil action shall not bar such party or such party's legal representative from recovering damages for negligence resulting in death, personal injury, property damage or economic loss, if such party's negligence was less than the causal negligence of the party or parties against whom claim for recovery is made, but the award of damages to any party in such action shall be diminished in proportion to the amount of negligence attributed to such party. If any such party is claiming damages for a decedent's wrongful death, the negligence of the decedent, if any, shall be imputed to such party. Kan. Stat. Ann. § 60–258a(a).

ask whether plaintiff has presented sufficient evidence demonstrating that defendant's breach proximately caused his injuries, but instead, the court asks whether defendant's breach "contributed to the injuries and damages sustained" by plaintiff. *Id.* at 804. *See also* PIK–Civil 3d § 105.01 ("A party is at fault when he or she is negligent and that negligence caused or contributed to the event ·which brought about the injury or damages for which claim is made."). Furthermore, direct evidence of such connection is not necessary, but, rather, circumstantial evidence giving rise to a reasonable inference is sufficient.

The court finds this standard measurably different than the standard the majority in *Baker* espoused. In particular, under *Reynolds* the trier of fact is given more leeway in fashioning appropriate inferences based on the circumstantial evidence compared to *Baker*'s stern rejection of causation premised on "sheer speculation." A standard founded on the question of whether an act or omission contributed to an injury is far more lenient than one which asks whether an act or omission was the proximate cause of an injury.[5]

## 2. Conclusion

While ·plaintiff has certainly not presented any direct evidence that defendant's breach caused his injuries, the court finds plaintiff has presented ample circumstantial evidence demonstrating defendant's wrongful acts may have contributed to the accident and his injuries.[6] Plaintiff's evidence shows there was a three to six inch straight edge drop-off separating the roadway and shoulder. It is uncontested that plaintiff lost control of· his motorcycle shortly after breaching this drop-off. Greeno observed sparks emanating from plaintiff's motorcycle, and later observed that gouges were present ·in the vicinity of plaintiff's reentry onto the roadway and that blacktop was located within the motorcycle. Finally, Hamm concedes there were no edge markings or signs warning of the drop-off. Viewed in the totality and in light of the summary judgment standard elucidated earlier, the court finds sufficient evidence has been presented on the issue of causation for this matter to go to trial.[7] *See Reynolds*, 43 P.3d at 805 (inferring, based partially on observed "cattle tracks," that the cattle traveled through the fence gap even though no one

5. The court would note that with its opinion in *Reynolds*, the Kansas Supreme Court appears to be embracing the position advocated fifteen years ago by the dissenting Justices in *Baker*. *See generally Baker*, 731 P.2d at 283 ("The thrust of the majority opinion as written will be misleading to the bench and bar. If justice is to prevail under the comparative negligence statute enacted by the legislature, cases such as this must be treated and tried as comparative negligence cases with all parties involved in the incident and *contributing to the damages and injury available for the determination of comparative fault.*") (Schroeder, C.J., dissenting); *Id.* at 283–84 ("The evidence of a defective signal combined with the failure to stop affords· a reasonable basis for the conclusion that more likely than not the faulty signal caused the accident. That makes a prima facie case of negligence on the part of

those charged with the responsibility for traffic control.") (Herd, J., dissenting).

6. Once again, because Hamm does not challenge the issues of its duty or breach, the court assumes for purposes of adjudicating the present motion that Hamm is responsible for any road condition, which may have contributed to plaintiff's injuries.

7. Hamm's arguments regarding Greeno's competency to testify concerning his "roll bar catch" theory, has not been considered within this proceeding. In reaching its final conclusion, the court strictly limited its own consideration to Greeno's actual observations. The court declines to interpret Hamm's assertions as a motion in limine. Hamm, if it so desires, is encouraged to file such motion in accordance with the time restraints set by the pretrial order.

witnessed the event). For these reasons, Hamm's motion for summary judgment shall be denied.

### B. Dustrol's Motion for Summary Judgment

By impleading Dustrol, Hamm asserts that if it is liable for plaintiff's injuries, then Dustrol is required to indemnify it for any payment it may make. Hamm's third-party complaint levies three counts against Dustrol: (1) common law indemnity and/or contribution; (2) contractual indemnity; and (3) breach of contract. Dustrol asserts all three grounds are improper under Kansas law and Rule 14(a) of the Federal Rules of Civil Procedure.

As a starting point, it is helpful to first set forth the general parameters for third-party practice in federal court. The federal rules provide:

> At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all of part of the plaintiff's claim against the third-party plaintiff.

Fed.R.Civ.P. 14(a). "It is well established, however, that impleader is proper only where the third-party defendant's liability is 'in some way derivative of the outcome of the main claim.'" *Hefley v. Textron, Inc.,* 713 F.2d 1487, 1498 (10th Cir.1983) (quoting *United States v. Joe Grasso & Son, Inc.,* 380 F.2d 749, 751 (5th Cir.1967)).

Dustrol alleges Hamm's claims are not proper for an impleader action because, under Kansas law, Hamm will bear no responsibility for Dustrol's negligence. In short, "[b]ecause Dustrol is not responsible for Hamm's negligence and Hamm is not responsible for Dustrol's negligence under Kansas law, Dustrol was not properly impleaded into this action pursuant to Rule 14(a) of the Federal Rules of Civil Proce-

dure." (Dustrol's Mem. in Support at 5). The court disagrees.

#### 1. Contribution

 The first count of the third-party complaint alleges Hamm is entitled to contribution. Under comparative fault, however, the concept of joint and several liability has been abolished in Kansas. *Wilson v. Probst,* 224 Kan. 459, 581 P.2d 380, 384 (1978) (citing *Brown v. Keill,* 224 Kan. 195, 580 P.2d 867 (1978)). The traditional doctrine of contribution between joint tortfeasors is unnecessary; for "[t]he individual liability of each defendant for payment of damages will be based on proportionate fault ...." *Id. See also Hefley,* 713 F.2d at 1498 ("Kansas has eliminated contribution and indemnity among joint tortfeasors in comparative negligence cases"). Therefore, to the extent Hamm is asserting a claim for contribution, the court finds Dustrol is entitled to judgment as a matter of law.

#### 2. Indemnification

 Both the first and second counts of the third-party complaint assert claims for indemnification. While Kansas' comparative fault statute effectively abolished contribution among joint tortfeasors, indemnification, on the other hand, still exists in limited contexts. As will be discussed below, contractual indemnification, both under express and implied theories, is a viable claim. Without question, however, the traditional "concept of indemnification based on the dichotomy of active/passive negligence" is no longer available. *Haysville Unified Sch. Dist. No. 261 v. GAF Corp.,* 233 Kan. 635, 666 P.2d 192, 199 (1983). *See also Kennedy v. City of Sawyer,* 228 Kan. 439, 618 P.2d 788, 789 (1980). While the third-party complaint is unclear, to the extent Hamm is arguing it is entitled to indemnification due to any imba-

lance in the parties' proportionate fault, such a claim is contrary to Kansas law.[8] In sum, the court finds Dustrol is entitled to judgment as a matter of law on the first count of the third-party complaint.

### 3. Contractual Indemnification

■ Within count two, Hamm asserts a contractual indemnity claim. The count specifically directs the court to a "hold harmless" agreement embodied in the subcontractor agreement executed by Hamm and Dustrol. As noted earlier, express contractual indemnity claims are certainly viable under Kansas law, and the court will interpret the impact of the indemnification clause below. Yet, the parties also blend the concept of vicarious liability within their respective discussions of Hamm's contractual indemnity claim. The issue of vicarious liability is generally only relevant when considering a claim of implied contractual indemnity. According to Hamm, however, "if the court rules as a matter of law, that Hamm cannot be held vicariously liable for the actions of Dustrol, then Hamm does not have an indemnity claim, either equitable or contractual, against Dustrol ...." (Hamm's Response at 5). This statement is an oversimplification and confuses two distinct theories of indemnification. The court will endeavor to better delineate the issues within its own discussion.

#### a. Express Contractual Indemnity

In the present case, the subcontractor agreement entered into between Hamm and Dustrol contains a rather standard "hold harmless" agreement. The relevant portion of the contract states:

> The Subcontractor [Dustrol] further specifically obligates himself to the Contractor [Hamm] in the following respect, to-wit: ... (b) To indemnify the Contractor against and save him harmless from claims, suits or liability for injuries to property, injuries to persons including death, and from any other claims, suits or liability on account of any act or omission of the Subcontractor, or any of his officers, agents, employees or servants.

(Third–Party Complaint, Ex. A § 10).

According to Hamm, "if the court finds Hamm must pay plaintiff for damages resulting from work performed by Dustrol or any of its officers, agents, employees, or servants, then Dustrol is liable to Hamm pursuant to contractual indemnity ...." (Third Party–Complaint at 4). On the other hand, Dustrol asserts that due to comparative fault, Hamm will only be liable for its own negligence and will never be forced to pay for the negligent work of Dustrol. In essence, Dustrol's position is that comparative fault, standing alone, obviates any claim for indemnification under the contract Hamm may have against it. While the court agrees with Dustrol's final conclusion, the court finds Dustrol's analysis omits an essential step.

In *Southwest Nat'l Bank v. Simpson & Son, Inc. ("Southwest")*, 14 Kan.App.2d 763, 799 P.2d 512 (1990), the Kansas Court of Appeals was faced with a similar claim of contractual indemnity. In the underly-

---

8. Furthermore, Hamm's general allegation in its first count that it is entitled to indemnification if it is liable for Dustrol's negligence fails to state a proper impleader claim under the federal rules. Rule 14(a) makes clear that impleader actions do not lie for an alleged breach of a duty owed by the third-party defendant to the plaintiff. Instead, impleader is proper only if the third-party defendant "is or may be liable *to the third-party plaintiff* for all or part of the plaintiff's claim against the third-party plaintiff." Fed.R.Civ.P. 14(a) (emphasis added). No where within Hamm's first count is any allegation raised, which indicates the existence of any duty or obligation owed to Hamm that was breached by Dustrol.

ing personal injury case, the indemnitee, Southwest National Bank ("Bank"), and the indemnitor, Simpson & Son, Inc. ("Simpson"), were sued by a construction laborer injured while working on the Bank's premises. *Id.* at 513–14. Simpson was the general contractor retained by the Bank. *Id.* at 513. Although Simpson settled with the plaintiff, the case proceed to trial, and the jury returned a sizeable verdict in favor of the plaintiff. *Id.* at 514. While the jury found Simpson to be eighty-five percent at fault, the plaintiff and the Bank were both found to be seven and a half percent at fault. *Id.* The Bank later sued Simpson, seeking indemnification for the Bank's proportional share of the verdict, pursuant to a indemnification clause contained in Simpson's contract. *Id.*

The indemnification clause at issue in *Southwest* obligated Simpson to indemnify the Bank if the loss or claim was

> caused in whole or in part by any negligent act or omission of the Contractor, any Subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts many of them

may be liable, regardless of whether or not it is caused in part by a party indemnified hereunder.

*Id.* at 519.[9]

Although not discussed by the Kansas Court of Appeals, the above contractual language lends itself to but one interpretation, namely, Simpson agreed to indemnify the Bank for Simpson's own negligence and the negligence of the Bank.[10] The absence of any discussion of this conclusion by the Kansas Court of Appeals strikes the court as odd considering that "[u]nder Kansas law, agreements in which one party agrees to indemnify another for the indemnitee's own negligence are disfavored and as such must be expressed in 'clear and unequivocal language.'" *Neustrom v. Union Pac. R.R.*, 156 F.3d 1057, 1062 (10th Cir.1998) (quoting *Zenda Grain & Supply Co. v. Farmland Indus.*, 20 Kan. App.2d 728, 894 P.2d 881, 887 (1995)). *See also Johnson v. Board of County Comm'rs*, 259 Kan. 305, 913 P.2d 119, 136 (1996) ("It is a general rule that a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting from his own negligent acts . . . .")

---

9. In its totality, the clause reads:

> To the fullest extent permitted by law, the Contractor [Simpson] shall indemnify and hold harmless the Owner [the Bank] and the Architect and their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from the performance of the Work, provided that any such claim, damage, loss or expense (1) is attributable to bodily injury, sickness, disease or death, to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, and (2) is caused in whole or in part by any negligent act or omission of the Contractor, any Subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts many of them may be liable, regardless of whether or not it is caused in part by a party indemnified hereunder. Such obli-

gation shall not be construed to negate, abridge, or otherwise reduce any other right or obligation of indemnity which would otherwise exist as to any party or person described in this Paragraph 4.18. *Southwest*, 799 P.2d at 519.

10. The *Southwest* court identified three necessary requirements for operation of the indemnification language: "(1) The claim, damage, or loss must have arisen out of the performance of the work; (2) the claim, damage, or loss must have been attributable to bodily injury; and (3) the claim, damage, loss, or expense must have been caused in whole or in part by the negligence of Simpson." 799 P.2d at 519. As to the causation element, the *Southwest* court found that "the jury concluded Simpson to have been 85 percent at fault for causing the injury, thus satisfying the third condition precedent to a claim or indemnification." *Id.*

(internal citation and quotation marks omitted).

In any event, after finding the Bank had not waived its claim for indemnification, the Kansas Court of Appeals found the Bank was entitled to judgment on its indemnification claim against Simpson. *Southwest*, 799 P.2d at 520–21. The court discusses *Southwest* because it is an ideal example of how Kansas' comparative fault doctrine guides the operation of subsequent contractual indemnification claims. Contrary to Dustrol's apparent position, comparative fault does not represent the full extent of possible indemnification in Kansas.

■ Returning to the indemnification clause presently before the court, neither party proffers a position on whether or not the indemnification clause covers Hamm's own negligence. Under the clause, Dustrol agreed to indemnify Hamm for claims "on account of any act or omission of the Subcontractor, or any of his officers, agents, employees or servants." This language is clear and unambiguous, so the court easily concludes that Hamm did not bargain for, nor receive, indemnification for its own negligent conduct. *See generally Hall v. JFW, Inc.*, 20 Kan.App.2d 845, 893 P.2d 837, 840 (1995) ("Unambiguous contracts are enforced according to their plain, general, and common meaning in order to ensure the intentions of the parties are enforced."). *See also Allied Hotels Co. v. H. & J. Constr. Co.*, 376 F.2d 1, 2 (10th Cir.1967) ("Courts may not read into an indemnity contract that which does not actually appear in it or which is not warranted by a reasonable interpretation.").

If Hamm is found to be at fault in this matter, then, pursuant to comparative fault, Hamm will be liable for its own negligence, and Dustrol will have no obligation under the contract to indemnify Hamm for its proportional share of the fault. *See Shoup v. Higgins Rental Ctr., Inc.*, 991 F.Supp. 1265, 1267 (D.Kan.1998) (dismissing, within negligence action, third-party complaint when indemnification clause did not unequivocally cover indemnitee/third-party plaintiff's own negligence). On the other hand, as *Southwest* demonstrates, if Hamm had negotiated for indemnification for its own negligence, then Dustrol would be contractually obligated to reimburse Hamm. This conclusion would seem to necessitate judgment for Dustrol, however, the following discussion of implied indemnification may alter the court's final ruling.

### b. Implied Contractual Indemnity

■■■ ■ In Kansas, an action for implied contractual indemnity arises "when one party without fault is compelled to pay for the tortious acts of another." *Bick v. Peat Marwick & Main*, 14 Kan.App.2d 699, 799 P.2d 94, 102 (1990) (citing *Haysville*, 666 P.2d at 199; *Kennedy*, 618 P.2d at 803). The claim is most applicable to situations wherein a principal is obligated, pursuant to the doctrine of respondeat superior, to pay a third party for the negligent acts of an agent. *Kennedy*, 618 P.2d at 799–800. Under Kansas law, however, one who employs an independent contractor, as compared to his own agent, is generally not vicariously liable for the negligent acts of the contractor.[11] *See Mitzner v. State*, 257 Kan. 258, 891 P.2d 435, 438 (1995) (acknowledging general rule of no liability).

---

11. One who employs an independent contractor to do work that is inherently dangerous may be liable for the contractor's negligence. *Wilson v. Daytec Constr. Co.*, 22 Kan.App.2d 401, 916 P.2d 72 (1996). This issue is not present in the pretrial order, nor is the argument raised by any party that road construction is an inherently dangerous activity. As such, the court finds the exception inapplicable in this case.

See also *Falls v. Scott*, 249 Kan. 54, 815 P.2d 1104, 1112 (1991) (defining "independent contractor" and recognizing "right-of-control" test); PIK–Civil 3d § 107.30 (defining independent contractor). To this end, Dustrol argues the parties were not engaged in an employer-employee relationship, but, rather, Dustrol was related to Hamm as an independent contractor. As quoted earlier, Hamm does not dispute Dustrol's assertion.

The court must, within this motion for summary judgment, be cautious in deciding Dustrol's employment classification, for the Kansas Supreme court has long held that:

> Where the facts are undisputed or the evidence is susceptible of only a single conclusion, it is a question of law for the court whether one is an employee or an independent contractor. However, generally speaking, the question of whether an individual is an employee or an independent contractor is considered a question of fact for the jury or trier of facts.

*Falls*, 815 P.2d at 1112 (citing *Baker v. Magnolia Petroleum Co.*, 111 Kan. 555, 207 P. 789 (1922)).

Although in the present motion both parties agree Dustrol was an independent contractor, the pretrial order specifically identifies the status of Dustrol as a triable issue of fact. Drawing its language from the controlling "right-of-control" test, the pretrial order asks "[w]hether Hamm actually exercised control over Dustrol's work on the construction project." (Pretrial Order at 13). The record before the court is simply too limited for the court to determine as a matter of law that Dustrol was an independent contractor. In particular, there is no evidence before the court demonstrating Hamm's right to control Dustrol's operation or Hamm's actual involvement in the Highway 75 construction project. At most, the court is left only with Dustrol's assertion regarding its status and Hamm's corresponding admission that its third-party complaint is moot if the court rules in Dustrol's favor.[12] Such argument is simply insufficient to erase the identified issue of fact pending in this case. As such, this issue must proceed to trial for a factual determination by the jury. *See Kiser v. Building Erection Servs., Inc.*, 973 F.Supp. 1269, 1276 (D.Kan.1997). Dustrol's motion for summary judgment shall be denied as to this issue.

12. In addition, the court is hesitant to rule in accordance with Hamm and Dustrol's position because of the effect such a ruling would have on plaintiff's claim. Although Dustrol argues plaintiff failed to present the issue of vicarious liability in his amended complaint, the pretrial order, which now controls the issues in this case, definitively raises a vicarious liability theory within plaintiff's allegation of negligence. *See* Fed.R.Civ.P. 16(e) (providing that a pretrial order entered after a pretrial conference "shall control the subsequent course of the action unless modified by a subsequent order"); *Hullman v. Board of Trs. of Pratt Cmty. Coll.*, 950 F.2d 665, 667 (10th Cir.1991) ("pretrial order supersedes all pleadings and controls the subsequent course of the litigation"); *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 817 (10th Cir.1979) ("When issues are defined by the pretrial order, they ought to be adhered to in the absence of some good and sufficient reason.") (internal citation and quotation marks omitted); *Taylor v. Reo Motors, Inc.*, 275 F.2d 699, 704 (10th Cir.1960) ("triable issues" agreed upon in pretrial order "ought not be altered or modified except to prevent manifest injustice").

With Hamm electing not to raise the issues of duty or breach in its own motion for summary judgment, plaintiff has had no opportunity to argue or present evidence on the issue of vicarious liability. A ruling that such liability does not exist, based only on assertions submitted by the two parties positioned to benefit from such a ruling, would effectively deny plaintiff one of his identified theories of recovery.

### c. Contractual Indemnity Conclusion

If it is determined by the jury that Hamm is vicariously liable for Dustrol's negligence, then Hamm may have an independent claim for implied indemnification. However, a claim for implied indemnity is foreclosed to an indemnitee who itself was negligent, apart from the negligence imputed to it by its employee. In short, an indemnitee may only be implicitly indemnified when it is completely without fault. *See United States Fid. & Guar. Co. v. Sulco, Inc.*, 939 F.Supp. 820, 825 (D.Kan.1996) ("The court finds that where, as in this case, vicarious liability gives rise to a claim for implied contractual indemnity, Kansas law requires the [indemnitee] to be faultless in order to recover; that is, [the indemnitee]'s liability must be solely derivative.") (citing Kansas cases). *See also St. Francis Reg'l Med. Ctr. v. Critical Care, Inc.*, 997 F.Supp. 1413, 1432 (D.Kan. 1997) (noting that because implied indemnification is equitable in nature, it is generally unavailable to malfeasants). As the case stands now, plaintiff is asserting that Hamm is liable for its own negligence and/or vicariously liable for the negligence of Dustrol. If the jury finds Hamm itself was negligent and at fault, then Hamm's claim for implied contractual indemnity must be denied.

The situation is made more complicated, however, by the existence of the subcontractor agreement's indemnification clause. While the court previously determined Hamm has no right under the contract to be indemnified for its own negligence, Hamm does have a claim under the contract to be indemnified for losses it sustains as a result of Dustrol's negligence. If, therefore, Hamm is found to be vicariously liable for Dustrol's negligence-while also found to be negligent itself, foreclosing an implied indemnity claim-Hamm may still recover under the contract the propor-

tional share of the verdict Hamm must pay on account of its vicarious liability.

The manner in which Hamm may seek indemnification is, hence, dependent on the allocation of fault made by the jury. These issues turn first and foremost on the jury's determination of vicarious liability. The court identifies these issues now, only to aid the parties as they prepare for trial.

### 4. Breach of Contract

The last count of the third-party complaint alleges Dustrol breached the subcontractor agreement by failing to maintain proper insurance coverage. The relevant section of the contract states:

> The subcontractor shall also provide and maintain in full force and effect during the term of this subcontract insurance (including but not limited to insurance covering the operation of automobiles, trucks, and other vehicles) in a company satisfactory to the contractor, protecting the subcontractor, the owner, and the contractor against liability from damages because of injuries, including death, suffered by persons other than employees of the subcontractor and liability from damages to property, arising from and growing out of the subcontractor's operations in connection with the performance of this subcontract.

(Third–Party Complaint, Ex. A § 9).

In arguing for summary judgment, Dustrol states the claim is not proper under Rule 14(a) because "[p]laintiff Nolde made no contractual claims against Hamm, and the issue of whether insurance existed is not derivative or dependent on Nolde's negligence claims." (Dustrol's Mem. in Support at 9). The court is perplexed by Dustrol's assertion. The type of contractual claim Dustrol envisions was available to plaintiff is lost on the court. More importantly, however, for purposes of impleader it is of no consequence that

the original claim brought against the defendant is of a different character than the claim brought against the third-party defendant. What is critical is that the claim against the third-party defendant be derivative or dependent upon the outcome of the plaintiff's claim. *See, e.g., Clark v. Associates Commercial Corp.,* 149 F.R.D. 629, 634 (D.Kan.1993) ("Thus, the third-party claim need not be based on the same theory as the main claim . . . .").

In the present case, the type of insurance coverage contemplated by the contract is directly implicated by plaintiff's claim against Hamm. Dustrol's alleged failure to provide such insurance may certainly create a loss for Hamm, for which Hamm may seek to recoup pursuant to the contract. In sum, the claim is proper under Rule 14(a), and the court denies Dustrol's request for summary judgment.

## IV. CONCLUSION

### A. Hamm's Motion for Summary Judgment

Hamm sought summary judgment on the singular issue of causation. The court determined that sufficient circumstantial evidence existed demonstrating the road conditions contributed to plaintiff's injuries. The motion shall be denied.

### B. Dustrol's Motion for Summary Judgment

Dustrol sought summary judgment on Hamm's third-party complaint. While the court found Dustrol entitled to judgment on the third-party complaint's first count, the court rejected Dustrol's assertion that Kansas' comparative fault doctrine fully obviated or satisfied Hamm's claim for indemnification. Furthermore, the court found a genuine issue of material fact in regards to Dustrol's status as an independent contractor prevented the court from granting Dustrol's motion for summary

judgment. The motion shall be granted in part and denied in part.

### C. Hamm's Motion for Revisions

Hamm has filed an uncontested motion to make certain typographical corrections and insignificant revisions to the pretrial order. Having reviewed the requested revisions, the court finds good cause exists to grant the motion. The revisions, as detailed in Hamm's motion, are accepted and adopted by the court, and the pretrial order shall be considered to reflect the same.

**IT IS THEREFORE BY THIS COURT ORDERED** that Defendant/Third–Party Plaintiff Hamm Asphalt, Inc.'s Motion for Summary Judgment (Doc. 83) is denied, and Third–Party Defendant Dustrol, Inc.'s Motion for Summary Judgment (Doc. 78) is granted in part and denied in part in accordance with the terms of the above memorandum.

**IT IS FURTHER ORDERED BY THIS COURT** that Defendant/Third–Party Plaintiff Hamm Asphalt, Inc.'s Motion for Revisions to Pretrial Order (Doc. 88) is granted.